05-6036-cr(l)
*United States v. Williams*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT


August Term 2006

(Argued: April 16, 2007          Decided: October 23, 2007)

Docket Nos. 05-6036-cr(L), 05-6038-cr(CON), 05-6065-cr(CON)

--------------------------------------------------------x

UNITED STATES OF AMERICA,

          Appellee,

                    -- v. --

ELIJAH BOBBY WILLIAMS, a.k.a. Bosco, a.k.a. Bobby
Torres, XAVIER WILLIAMS, a.k.a. X, a.k.a. Richie
Torres, REVEREND MICHAEL WILLIAMS, a.k.a. David
Michael Torres, a.k.a. Mike Torres, a.k.a. Mike
Foster,

          Defendants-Appellants.

--------------------------------------------------------x

B e f o r e :  NEWMAN, WALKER, and STRAUB, Circuit Judges.

     Appeals from judgments entered in the United States District

Court for the Southern District of New York (Naomi Reice

Buchwald, Judge), convicting and sentencing appellants for

various offenses, including narcotics trafficking, racketeering,

and murder.

     AFFIRMED.

DAVID A. RUHNKE, Ruhnke & Barrett, Montclair, New Jersey, for Elijah Williams.

RICHARD B. LIND, New York, New York, for Michael Williams.

DAVID STERN, Rothman Schneider Soloway & Stern, LLP, New York, New York, for Xavier Williams.

HELEN V. CANTWELL, Assistant United States Attorney (Michael J. Garcia, United States Attorney for the Southern District of New York, Glen G. McGorty and Robin L. Baker, Assistant United States Attorneys, on the brief), New York, New York.

JOHN M. WALKER, JR., Circuit Judge:

Defendants-appellants Elijah Bobby Williams ("Bobby"), Michael Williams, ("Michael"), and Xavier Williams ("Xavier") appeal from judgments entered in the United States District Court for the Southern District of New York (Naomi Reice Buchwald, Judge), convicting them of and sentencing them for various offenses, including narcotics trafficking, racketeering, and murder. In a concurrently filed summary order, we address most of appellants' arguments and find them without merit. In this opinion, we consider: (1) Michael's contention that the district court erred in admitting Bobby's self-inculpatory out-of-court statements that also implicated Michael, and (2) Bobby's claim that the district court abused its discretion in concluding that the methodology employed by the government's firearms

2

identification expert met the reliability standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). We hold that the district court did not err on either score. Accordingly, we affirm the convictions and sentences.

**BACKGROUND**

On a gelid night in February 1996, residents along the 1100 block of Sperling Drive, a residential street in Wilkinsburg, Pennsylvania, were startled by the ringing sound of gun shots. One resident who rushed to see what had happened saw two people shooting into a Ford Bronco parked alongside the street. Another observed a mid-sized car darting away from the scene immediately after the shooting ceased. But neither was able to describe the shooters in detail.

Once the commotion passed, one of the residents approached the Ford Bronco. Inside she found the bullet-riddled bodies of Joel Moore, Timothy Moore, and Robert James. Law enforcement was called, a crime scene was established, and an investigation immediately ensued.

The indictments that followed charged appellants with operating a violent criminal organization that existed for the purpose of, among other things, enriching its members by trafficking in cocaine and cocaine base in New York and Pennsylvania. Because the government sought the death penalty against Bobby and Michael for their roles in the triple homicide,

3

they were tried separately from Xavier on a superceding indictment that charged fifteen counts: racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count Two); conspiracy to murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5) (Counts Three and Four); murder in aid of racketeering activity, in violation of 18 U.S.C. §§ 2, 1959 (a)(1) (Counts Five through Seven); conspiracy to distribute narcotics, in violation of 21 U.S.C. § 846 (Count Eight); murder while engaged in a narcotics conspiracy, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 848(e) (Counts Nine through Eleven); use of a firearm during and in relation to a drug trafficking crime or crime of violence, in violation of 18 U.S.C. §§ 2, 924(j) (Counts Twelve through Fourteen); and conspiracy to launder money derived from narcotics trafficking, in violation of 18 U.S.C. § 1956(h) (Count Fifteen). The jury found Bobby and Michael guilty on all counts except Counts Three and Four but determined that they should not receive the death penalty. Bobby and Michael were sentenced principally to life imprisonment.

Xavier was tried on a superceding indictment charging fourteen counts that matched Bobby's and Michael's indictment through Count Thirteen, omitted one of the firearm counts, and charged the money laundering count as Count Fourteen instead of

4

Fifteen. Upon the government's motion, the district court dismissed Counts Five, Six, Seven, Nine, Ten, Eleven, and Twelve. The jury found Xavier guilty on all remaining counts except Count Four. He was sentenced principally to life imprisonment.

The remaining facts and procedural history are provided as necessary for our analysis of the specific issues addressed in this opinion.

## DISCUSSION

## I.   Admission of Bobby's Out-of-Court Statements

Prior to the trial of Bobby and Michael, the government requested permission to introduce, against both defendants, statements Bobby made to Carol Johnson, Earl Baldwin, and Julian Brown about his involvement in the triple homicide. Michael objected and moved for exclusion and, in the alternative, requested a severance pursuant to Fed. R. Crim. P. 14. After hearing from both sides, the district court denied the severance and allowed Johnson and Baldwin, but not Brown, to testify about Bobby's statements, finding their testimony admissible under the exception to the hearsay rule for statements against penal interest. See Fed. R. Evid. 804(b)(3). The district court also found no Confrontation Clause impediment to the admission of Johnson's and Baldwin's testimony.

At trial, Baldwin testified that Bobby admitted to him on two separate occasions that he participated in the triple

5

homicide.  Bobby first told Baldwin that Timothy Moore was killed because the "Dude owed" money.  The second time, Bobby, speaking about himself and Michael, stated: "[W]e gave it to them niggers. . . . [W]e walked up to the truck, each of us on a side of the truck and gave it to them niggers."  Johnson, echoing much of Baldwin's account, testified that Bobby told her that the victims were shot because of their debts.  She then explained that Bobby told her that Michael shot the man in the driver's seat while Bobby shot at least one of the other passengers.  Johnson's testimony did not account for the shooting of the third victim.

In this challenge to the district court's pretrial ruling, Michael argues again that the admission of Bobby's out-of-court statements violated both Rule 804(b)(3) and the Confrontation Clause.  We review the district court's admissibility determination under Rule 804(b)(3) for abuse of discretion and its Confrontation Clause analysis de novo.  United States v. Tropeano, 252 F.3d 653, 657 (2d Cir. 2001).

**A.  Admissibility under Rule 804(b)(3)**

Admission of a statement under Rule 804(b)(3) hinges on "whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'"  Williamson v. United States, 512 U.S. 594, 603-04 (1994) (quoting Rule 804(b)(3)).  Whether a challenged statement

6

is sufficiently self-inculpatory can only be answered by viewing it in context. Id. at 604. Thus, this determination must be made on a case-by-case basis. See Tropeano, 252 F.3d at 658.

We find no abuse of discretion in the district court's decision to admit the challenged statements under Rule 804(b)(3). The first of Bobby's statements to Baldwin was plainly self-inculpatory, and it did not on its face implicate Michael. The second of Bobby's statements to Baldwin and his statement to Johnson were also sufficiently self-inculpatory as they described acts that he and Michael committed jointly. See United States v. Saget, 377 F.3d 223, 231 (2d Cir. 2004) (finding that the bulk of confessor's statements were self-inculpatory because they described acts that the defendant and the confessor committed jointly). Moreover, the context of these statements shows that Bobby was not attempting to minimize his own culpability, shift blame onto Michael, or curry favor with authorities. Cf. Williamson, 512 U.S. at 601, 603. To the contrary, in his second statement to Baldwin, Bobby was boastful regarding his participation in the murders, and in his remark to Johnson he claimed an equal role, asserting that he and Michael each killed one of the three victims.

**B.   Confrontation Clause Analysis**

The Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

7

confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause prohibits the admission of out-of-court "testimonial" statements against a criminal defendant, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. Crawford's per se bar on such testimonial statements displaced that much of the "indicia of reliability" standard of Ohio v. Roberts, 448 U.S. 56 (1980), that had allowed into evidence, as not violative of the Confrontation Clause, hearsay statements that fell within a firmly rooted hearsay exception or contained particularized guarantees of trustworthiness. Id. at 66; Crawford, 541 U.S. at 60; Saget, 377 F.3d at 226 (explaining that under Roberts, "[a]ny out-of-court statement was constitutionally admissible so long as it fell within an exception to the hearsay rule or, if that exception was not firmly rooted, the court found that the statement was likely to be reliable").

While Crawford's per se bar did away with Roberts' reliability analysis for testimonial statements, it left unclear whether the admission of "nontestimonial" statements would still implicate Confrontation Clause concerns because Crawford did not explicitly overrule Roberts on that score. See Saget, 377 F.3d at 227 ("Crawford leaves the Roberts approach untouched with respect to nontestimonial statements. . . . Accordingly, while

8

the continued viability of Roberts with respect to nontestimonial statements is in doubt, we will assume for purposes of this opinion that its reliability analysis continues to apply to control nontestimonial hearsay . . . .").  However, in Davis v. Washington, 126 S. Ct. 2266 (2006), the Court was required to "decide . . . whether the Confrontation Clause applies only to testimonial hearsay."  Id. at 2274 (emphasis added).  Answering that question in the affirmative, the Court explained that Crawford, even if it did not expressly so hold, pointed the way:

> The text of the Confrontation Clause reflects this focus on testimonial hearsay.  It applies to witnesses against the accused — in other words, those who bear testimony.  Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact.  An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

Id.  "A limitation so clearly reflected in the text of the constitutional provision," the Court continued, "must fairly be said to mark out not merely its 'core,' but its perimeter."  Id.

Following Davis, we stated in United States v. Feliz, 467 F.3d 227 (2d Cir. 2006), that Roberts' reliability analysis plays no role in a Confrontation Clause inquiry.  See id. at 230-32. It is plain from Davis "that the right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements."  Feliz, 467 F.3d at 231; see Tom Lininger,

9

Reconceptualizing Confrontation After Davis, 85 Tex. L. Rev. 271, 280 (2006) ("Whereas Crawford called into question the reasoning of Roberts, Davis sounded the death knell. The Davis Court indicated plainly that the protections of the Confrontation Clause are limited to testimonial hearsay.").

> Now, after Crawford and Davis, indicia of reliability
> play no role in the Confrontation Clause analysis.
> Rather, the inquiry under the Confrontation Clause is
> whether the statement at issue is testimonial. If so,
> the Confrontation Clause requirements of unavailability
> and prior cross-examination apply. If not, the
> Confrontation Clause poses no bar to the statement's
> admission.

Feliz, 467 F.3d at 232.

Michael does not, nor could he, contend that Bobby's statements were testimonial; they bear none of the hallmarks of testimonial statements identified in Crawford. See 541 U.S. at 51-52 (identifying as testimonial "ex parte in-court testimony," "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (internal quotation marks and citations omitted)); see also Saget, 377 F.3d at 228 (identifying as testimonial under Crawford "a declarant's knowing responses to structured questioning in an investigative environment or in a courtroom setting where the declarant would reasonably expect that his or

10

her responses might be used in future judicial proceedings"). Instead, relying on Roberts and its progeny, Michael asserts that the statements lack particularized guarantees of trustworthiness. Because the Confrontation Clause does not bar such nontestimonial statements, whatever their guarantees of trustworthiness, Michael's argument fails and our Confrontation Clause inquiry is at an end.

* * *

Accordingly, we conclude that the district court neither abused its discretion in admitting Bobby's out-of-court statements under Rule 804(b)(3) nor violated the Confrontation Clause in doing so.

## II.  The Government's Firearms Identification Expert

Spent bullets, cartridge casings, and bullet fragments were recovered from the scene of the triple homicide and the victims' bodies.  A subsequent search of Michael's apartment in Pittsburgh, Pennsylvania turned up two handguns, one of which was a 9mm Bryco semiautomatic pistol.  Shortly thereafter, this and other ballistics evidence was turned over to Michelle Kuehner, a firearms examiner in the Forensic Laboratory Division of the Allegheny County Coroner's Office (the "Forensic Lab").  Upon comparing the ballistics evidence recovered from the crime scene and the victims' bodies with bullets and cartridge casings produced from a test firing of the 9mm Bryco, Kuehner concluded

11

there was a "match."[1]

Before trial, the government placed Bobby and Michael on notice that it intended to call Kuehner as an expert witness. Michael moved for a pretrial Daubert hearing to challenge Kuehner's testimony,[2] contending that the government had yet to establish its admissibility under Fed. R. Evid. 702.

In an order dated December 22, 2004, the district court denied the motion without a hearing. It reasoned:

> Judge Marrero of this Court has recently upheld the use of ballistics as reliable under Rule 702. See United States v. Santiago, 199 F. Supp. 2d 101, 111-12 (S.D.N.Y. 2002). The Supreme Court has likewise cited ballistics as a proper subject of expert testimony because it aids the jury in understanding the evidence. See United States v. Scheffer, 523 U.S. 303, 312-313 (1998) ("unlike expert witnesses who testify about factual matters outside the juror's knowledge, such as the analysis of fingerprints, ballistics, or DNA found at a crime scene, a polygraph expert can supply the jury only with another opinion, in addition to its own, about whether the witness was telling the truth"); see also United States v. Foster, 300 F. Supp. 2d 375, 376 n.1 (D. Md. 2004) (stating that, "[i]n the years since Daubert, numerous cases have confirmed the reliability of ballistics identification," and collecting cases); [United States v. O'Driscoll, No. 4:CR-10-277, 2003 WL 1402040, at *2 (M.D. Pa. Feb. 10, 2003)] ("the field of ballistics is a proper subject for expert testimony and

---

[1] Apparently Bobby's and Michael's own firearms examiner came to the same conclusion as Kuehner.

[2] Though Bobby raises the issue on appeal and the parties indicate that he was the one who requested a Daubert hearing, the district court's order states that it was, in fact, Michael who made the request. United States v. Williams, No. S100CR.1008(NRB), 2004 WL 2980027, at *24 (S.D.N.Y. Dec. 22, 2004). This is of no moment, however, because appellants have joined one another's arguments pursuant to Fed. R. App. P. 28(i).

12

> meets the requirements of Rule 702.") . . . .
> Defendants have not offered any reason for us to depart
> from the reasoning of these cases. Accordingly, the
> request for a Daubert hearing to challenge the
> government's proposed ballistics . . . evidence is
> denied.

Williams, 2004 WL 2980027, at *24.

At trial, the government called Kuehner as an expert. She testified first about her background. Kuehner stated that she had served as a firearms examiner within the firearms section of the Forensic Lab for approximately twelve years. She testified that, in addition to the "hands-on training" she received from her section supervisor, Dr. Robert Levine, she attended seminars on firearms identification, including annual workshops put on by the Association of Firearm and Toolmark Examiners (the "AFTE") where firearms examiners from the United States and the international community gather to present papers on current topics within the field. Kuehner also explained that she and Dr. Levine published a paper in the AFTE Journal matching a bullet to the cartridge case from which it was discharged. Kuehner further stated that she has given presentations on the subject of firearms analysis at several AFTE meetings and for Duquesne University's forensic science and law programs. In addition, Kuehner testified that she had examined approximately 2,800 different types of firearms and provided expert testimony on between 20 and 30 occasions.

After establishing her background, training, and experience,

13

Kuehner went on to testify that she uses a firearms identification methodology that is a subset of a broader forensic discipline referred to as toolmark identification. Toolmark examiners are trained to examine the marks left by tools on a variety of surfaces in an attempt to "match" a toolmark to the particular tool that made it. Firearms, she explained, are simply the tools that impart marks on bullets and cartridge cases.[3]

Kuehner then testified as to how the methodology enables her to determine whether a given sample of ballistics components[4] was fired from the same gun. She starts by examining the components' "class characteristics." A spent bullet's class characteristics include its caliber, the number of its land and groove

_____

[3] For a thorough discussion of the firearms identification methodology employed by Kuehner see Theory of Identification, 30 Am. Firearms and Toolmark Examiners J. 86 (1998).

[4] The ballistics components relevant here include the spent bullets and cartridge casings recovered from the crime scene and the victims' bodies. It suffices for our analysis to recount Kuehner's testimony regarding the process by which she examines spent bullets, but we note that the process she employs in examining spent cartridge cases involves many of the same concepts.

impressions,[5] the twist of its land and groove impressions, and the width of its land and groove impressions. Class characteristics, Kuehner explained, allow her to narrow the universe of firearm possibilities to certain types of guns made by certain manufacturers. For example, a spent 9mm bullet exhibiting six land and groove impressions could only have been expelled from a firearm with a 9mm gun barrel that has six lands and grooves.

Once Kuehner narrows the firearms possibilities by class, she looks for specific random, microscopic imperfections in the barrel caused by changes in the manufacturing tool as it makes each barrel on the production line. These imperfections in turn leave unique "striations" on each bullet as it moves through the barrel. It is her examination of these unique marks, Kuehner testified, that allows her to determine whether two bullets were fired from the same gun.

Using a comparison microscope to view the two bullets side-by-side, she compares the height, depth, width, length and spatial relations of their striations. Significant similarity

---

[5] When a handgun is fired, its barrel imparts "rifling" on the bullet. Rifling places a twist on a bullet as it travels, thus promoting flight accuracy. Rifling, which runs the length of the barrel, consists of cuts called "grooves" and raised surfaces called "lands." As a bullet travels down the barrel, the raised lands press into the surface of the bullet and it likewise conforms to fill the recessed grooves. The corresponding marks left on the bullet are referred to as land and groove impressions.

between striations signals an "identification" or a "match" — that is, the bullets were fired from the same firearm. The striations need not be identical; they need only be in "sufficient agreement" based on Kuehner's training and experience. She explained:

> So I am looking at the number of striations, . . . their physical characteristics, their height, [and] their depth. And when the pattern of agreement exceeds the amount of agreement that I know exists in two bullets that have not been fired from the same firearm, then that is sufficient agreement.
>
> * * *
>
> You can't really put numbers to it. It's more, more coming from experience, so, which is why . . . you test bullets. So sufficient agreement meaning that you have enough agreement [between the striations on the bullets] than those that you know do not match.

Kuehner testified that, based on comparison of striations, there are two conclusions she may reach other than a match. She can make an "eliminat[ion]," concluding that the two bullets were not fired from the same gun. Or, she can make an "inconclusive" determination, meaning that, although the bullets exhibit similar class characteristics, there is not enough agreement or disagreement between their striations to conclude whether they were or were not fired from the same gun. Kuehner further explained that after she performs her examination, she documents her conclusions in a report, which Dr. Levine reviews. Based on her analysis in this case, Kuehner concluded that certain bullets and cartridge casings recovered from the crime scene and the

16

victims' bodies matched those she produced by test firing the 9mm Bryco.

Bobby now challenges the district court's decision to permit Kuehner to testify as an expert. We understand his argument to be that the district court abused its discretion by (1) denying him a Daubert hearing and (2) failing to undertake an adequate inquiry into the reliability of Kuehner's firearms identification methodology. The government counters that the district court acted within its discretion under the circumstances and that any error was harmless.[6] We review the district court's decision to admit expert testimony under Rule 702 for abuse of discretion. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). "A decision to admit scientific evidence is not an abuse of discretion unless it is manifestly erroneous." United States v. Salameh, 152 F.3d 88, 129 (2d Cir. 1998) (internal quotation marks omitted).

## A.    Gatekeeping under Daubert

While the proponent of expert testimony has the burden of

[6]    The government also contends that Bobby failed to preserve his claim of error as to the reliability of Kuehner's testimony because his pretrial challenge lacked the necessary specificity, which was never remedied by a further objection after Kuehner's trial testimony provided more persuasive grounds for objection. Therefore, the government argues that the district court's decision should be reviewed for plain error only. But we need not reach this point because we conclude that Bobby cannot satisfy the lower burden of abuse of discretion according to the record here.

establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, see Daubert, 509 U.S. at 593 n.10, the district court is the ultimate "gatekeeper." See Fed. R. Evid. 104(a); United States v. Cruz, 363 F.3d 187, 192 (2d Cir. 2004); see also Brooks v. Outboard Marine Corp., 234 F.3d 89, 91 (2d Cir. 2000) (rejecting argument that opposing expert testimony is necessary to trigger the district court's obligation to analyze admissibility of expert testimony). The Federal Rules of Evidence assign to it "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

In assessing reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks omitted). But these criteria are not exhaustive. See Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004). Daubert enumerated a list of additional factors bearing on reliability that district courts may consider: (1) whether a theory or technique has been or can

18

be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. See Daubert, 509 U.S. at 593-94.

"Daubert's list of specific factors," however, "neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire, 526 U.S. at 141. Rather, the district court's inquiry into the reliability of expert testimony under Rule 702 is a "flexible one." Daubert, 509 U.S. at 594. Accordingly, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 142. Yet while the district court's discretion is considerable, it is not unfettered: It does not permit the district court "to perform the [gatekeeping] function inadequately." Id. at 158-59 (Scalia, J., concurring) (noting that the majority opinion "makes clear that the discretion it endorses — trial-court discretion in choosing the manner of testing expert reliability — is not discretion to abandon the gatekeeping function").

As an initial matter, we reject Bobby's contention that the

19

district court abused its discretion by denying his request for a hearing. While the gatekeeping function requires the district court to ascertain the reliability of Kuehner's methodology, it does not necessarily require that a separate hearing be held in order to do so. See id. at 152 (district courts possess "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability"); see also United States v. Alatorre, 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere . . . does the Supreme Court mandate the form that the inquiry into . . . reliability must take. . . ."). This is particularly true if, at the time the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record. See 4 Weinstein's Federal Evidence § 702.02[2] (Joseph M. McLaughlin ed., 2d ed. 2006).

The remaining question, then, is whether there was a sufficient foundational basis in the record to support the trial court's decision to admit Kuehner as an expert?

First, the district court noted with approval the decision in Santiago rejecting a challenge to the reliability of the government expert's firearms identification methodology as "pseudo-science." 199 F. Supp. 2d at 111. The Santiago court stated that the government had submitted a letter describing, among other things, the method that the expert used to "match

20

particular guns to the bullets in question." Id. Moreover, the preliminary ruling below in Santiago had accepted that much of the reliability inquiry would occur when the government laid the foundation preliminary to the district court's admitting the expert's testimony. See 199 F. Supp. 2d at 112 (noting that in addition to expecting the government to ask about the expert's "training, experience, qualifications, and the methods he used to match the bullets with the guns in question," the court was "interested to learn how often [the expert's] identifications have been wrong in the past and the degree to which his methodology has been accepted in the community of forensics experts").

We think that Daubert was satisfied here. When the district court denied a separate hearing it went through the exercise of considering the use of ballistic expert testimony in other cases. Then, before the expert's testimony was presented to the jury, the government provided an exhaustive foundation for Kuehner's expertise including: her service as a firearms examiner for approximately twelve years; her receipt of "hands-on training" from her section supervisor; attendance at seminars on firearms identification, where firearms examiners from the United States and the international community gather to present papers on current topics within the field; publication of her writings in a peer review journal; her obvious expertise with toolmark

21

identification; her experience examining approximately 2,800 different types of firearms; and her prior expert testimony on between 20 and 30 occasions. Under the circumstances, we are satisfied that the district court effectively fulfilled its gatekeeping function under Daubert. The trial court's admission of Kuehner's testimony constituted an implicit determination that there was a sufficient basis for doing so. The formality of a separate hearing was not required and we find no abuse of discretion.

We do not wish this opinion to be taken as saying that any proffered ballistic expert should be routinely admitted. Daubert did make plain that Rule 702 embodies a more liberal standard of admissibility for expert opinions than did Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). See Daubert, 509 U.S. at 588 (holding that the Frye test of general acceptance in the scientific community was superceded by the Federal Rules); see also Amorgianos, 303 F.3d at 265 (observing departure, under Federal Rule, from the Frye standard). But this shift to a more permissive approach to expert testimony did not abrogate the district court's gatekeeping function. Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005). Nor did it "grandfather" or protect from Daubert scrutiny evidence that had previously been admitted under Frye. See United States v. Crisp, 324 F.3d 261, 272 (4th Cir. 2003) (Michael, J., dissenting); see also

22

*United States v. Saelee*, 162 F. Supp. 2d 1097, 1105 (D. Alaska 2001) ("[T]he fact that [expert] evidence has been generally accepted in the past by courts does not mean that it should be generally accepted now, after *Daubert* and *Kumho [Tire]*."). Thus, expert testimony long assumed reliable before Rule 702 must nonetheless be subject to the careful examination that *Daubert* and *Kumho Tire* require. *See Daubert*, 509 U.S. at 589 (explaining that Rule 702 requires district courts to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable"); *id.* at 592 n.11 ("Although the *Frye* decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence. Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."); *see also Kumho Tire*, 526 U.S. at 152 (explaining that whether a witness's area of expertise is technical, scientific, or more generally "experience-based," Rule 702 requires the district court to fulfill the gatekeeping function of ensuring that his or her testimony is reliable). Because the district court's inquiry here did not stop when the separate hearing was denied, but went on with an extensive consideration of the expert's credentials and methods, the jury could, if it chose to do so, rely on her testimony which was relevant to the issues in the case. We find

that the gatekeeping function of <u>Daubert</u> was satisfied and that there was no abuse of discretion.

**CONCLUSION**

For the foregoing reasons and those provided in the concurrently filed summary order, appellants' convictions and sentences are AFFIRMED.

24