*Water Pollution Control Authority of the City of Norwalk v. Flowserve US, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 30th day of July, two thousand nineteen.

Present:
>    DENNIS JACOBS,
>    DEBRA ANN LIVINGSTON,
>    JOSEPH F. BIANCO,
>        *Circuit Judges*.

_____

WATER POLLUTION CONTROL AUTHORITY OF THE
CITY OF NORWALK,

>    *Plaintiff-Third-Party-Plaintiff-Appellant*,

>    v.                                                        18-1288

FLOWSERVE US, INC.,

>    *Defendant-Third-Party-Plaintiff-Counter-Defendant-*
>    *Counter-Claimant-Appellee*,

GILBANE BUILDING COMPANY,

>    *Third-Party-Defendant-Counter-Claimant-Appellee*.

_____

For Plaintiff-Third-Party-
Plaintiff-Appellant:                         MARTHA C. GAYTHWAITE, Verrill Dana LLP, Portland
                                             ME; Calvin K. Woo, Verrill Dana LLP, Westport, CT.

For Defendant-Third-Party-Plaintiff-
Counter-Defendant-Counter-
Claimant-Appellee:

JASON P. ECKERLY, Martha E. Drouet, Segal McCambridge Singer & Mahony, Ltd., Chicago, IL.

For Third-Party-Defendant-Counter-
Claimant-Appellee:

JARED COHANE, Esq., Jeffrey J. Mirman, Esq., Hinckley, Allen & Snyder LLP, Hartford, CT.

Appeal from a judgment of the United States District Court for the District of Connecticut (Bryant, *J*.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

## I.    Background

In 2008, the Water Pollution Control Authority of the City of Norwalk ("WPCA") embarked upon a four-year project to upgrade its wastewater plant ("the Project"). WPCA hired Gilbane Building Company ("Gilbane") to manage the Project. Gilbane's duties included, among other things, soliciting and evaluating equipment bids and recommending winning bids to WPCA. In its role as manager, Gilbane conducted a public bid process for six "vertical non-clog dry pit submersible pumps" and associated control systems, ultimately awarding the contract to Flowserve US, Inc. ("Flowserve"), the low bidder. JA-207. Flowserve delivered the pumps to the wastewater plant in August 2011, where they were installed and put into operation by March 2012. At that point, WPCA's plant operator, OMI, Inc. ("OMI"), assumed responsibility for operation and maintenance of the pumps. OMI kept daily handwritten logs of plant equipment operation, including (1) daily operator checklists (which operators marked and recorded during their rounds); (2) work orders for routine and preventative maintenance; and (3) spot maintenance for specific issues that arose.

2

After the Flowserve pumps were put into operation, some of them began malfunctioning. Most significantly, in late July and early August 2013, OMI noted in its logs that Pumps 1 and 5 were running without pumping any liquid or were "airbound," meaning that air had entered the system and needed to be bled out. This is also known as "running dry." JA-1446–47. Running pumps dry can damage the seals and lead to "catastrophic seal failure." JA-1447. On August 12, 2013, OMI again noted in its logs that Pump 1 was airbound; the next day, Pump 1's primary mechanical seal failed. Pumps 1 and 5 were repaired by Associated Electro Mechanics, Inc. ("AEM"), a Flowserve-approved repair company. Upon inspection, AEM concluded that the mechanical seals in Pumps 1 and 5 had failed due to thermal shock from running dry. Flowserve denied WPCA's warranty claims for the seal inspections and repairs of Pumps 1 and 5, stating that AEM's inspection had revealed that the pumps had failed because of improper maintenance and use.

Following the denial of its warranty claims for Pumps 1 and 5, WPCA sued Flowserve in Connecticut state court. The action was removed to the United States District Court for the District of Connecticut (Bryant, *J*.) in April 2014. Flowserve then filed a third-party complaint against Gilbane.

While this litigation was ongoing, WPCA asked the company that had designed the project, Camp, Dresser & McKee ("CDM"), to investigate the pumps and determine whether they should be replaced. CDM concluded that it was not necessary to replace the pumps. Likewise, OMI never recommended that the pumps be replaced. Nevertheless, in January 2015, WPCA decided to redesign the pumping system and install new pumps, entering into a contract with Arcadis U.S., Inc.

WPCA filed its Third Amended Complaint ("TAC") on February 1, 2017. The TAC alleges seven causes of action against Flowserve: (1) strict products liability; (2) negligent products liability; (3) breach of express warranty; (4) breach of implied warranty of merchantability; (5) breach of implied warranty for a particular purpose; (6) third-party breach of contract; and (7) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). The TAC also alleged a single breach of contract claim against Gilbane. All three parties moved for summary judgment. In addition, Flowserve moved to exclude two experts that WPCA had disclosed for trial.

On March 28, 2018, the district court granted Flowserve's motions to exclude WPCA's experts, granted Flowserve's and Gilbane's motions for summary judgment against WPCA, and denied as moot Flowserve's and Gilbane's motions for summary judgment against each other. As to the experts, the district court determined that (1) WPCA's expert Judith Hodgson ("Hodgson") had relied on inadequate surveys, failed to consider relevant evidence, and failed to disclose calculations; and (2) WPCA's expert Bonneau Dickson ("Dickson"), in his expert report, lacked a sufficient explanation of reliable methodology. As to the motions for summary judgment, the district court determined that (1) WPCA's products liability claims against Flowserve failed because they were not supported by admissible expert testimony, and in any event the pumps complied with Project specifications; (2) WPCA's express and implied warranty claims against Flowserve failed because the final agreement either did not contain the cited warranties or expressly excluded any implied warranties; (3) WPCA's CUTPA claim against Flowserve failed because it is barred by the Connecticut Product Liability Act's ("CTPLA") exclusivity provision; and (4) WPCA's breach of contract claim against Gilbane failed because WPCA had offered no evidence that Gilbane advanced its own interests in breach of its fiduciary duty.

WPCA timely appealed.

## II.   Analysis

### A.  The District Court's Exclusion of Hodgson[1]

Hodgson is an engineer, hired by WPCA, who submitted a 108-page expert report to the district court explaining her conclusion that the Flowserve pumps had nine design defects that "were the cause of the pump failures and operational problems that plagued WPCA's operation of its treatment plant." SPA-15. The district court excluded Hodgson because, in part, she had reached her conclusion without considering evidence relevant to the possibility that the pumps had failed due to operator error in running the pumps dry, rather than because of design defects. In particular, Hodgson failed to review evidence regarding how the Flowserve pumps were maintained and operated, including "the deposition transcripts of most witnesses in this case, the daily log books recording Pump operation, the preventative maintenance records, or OMI's daily round checklists." SPA-35. As a result, the district court deemed Hodgson's conclusions unreliable.

We review a "district court's determination to admit or exclude expert testimony under *Daubert* for abuse of discretion." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002). "A decision to admit or exclude expert . . . testimony is not an abuse of discretion unless it is 'manifestly erroneous.'" *Id.* at 265 (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995)). The abuse-of-discretion standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Significantly, "it is critical that an expert's analysis be reliable at every step," and "*any* step that renders the analysis unreliable" under *Daubert*

---

[1] Because we determine *infra* that the exclusion of Hodgson alone dooms WPCA's claims, we do not address the district court's decision to exclude Dickson.

"*renders the expert's testimony inadmissible*." *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).

On appeal, WPCA argues that the district court abused its discretion in excluding Hodgson. WPCA contends that even though Hodgson may not have reviewed *all* relevant evidence as to the failure of the pumps, she *did* review Supervisory Control and Acquisition Data ("SCADA data"), which provides computerized information about the pumps' functioning; in WPCA's view, that is enough to render her conclusions reliable. We are not persuaded. First, WPCA did not mention the SCADA data in its papers below opposing the motion to exclude Hodgson, despite being alerted by Flowserve's papers to the argument that Hodgson had failed to consider all relevant evidence. WPCA has thus waived any argument that the SCADA data, without more, could render Hodgson's conclusions reliable. *See Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418 (2d Cir. 2001). Second, even if this argument were not waived, a review of the record demonstrates that the OMI logs provided important information relating to the cause of the pumps' failure not present in the raw SCADA data. The raw SCADA data merely conveys the status of the pumps—not the *cause* of that status. For instance, if a pump were running dry, SCADA data would not show whether the pump was running dry because of operator error or some design defect in the pump itself. A review of the OMI logs, then, would be critical to reliably make any sort of conclusion as to the *cause* of pump problems. Hodgson conceded that she did not review the OMI logs. As a result, we conclude that the district court did not abuse its discretion in excluding Hodgson.[2]

_____

[2] Nor did the court abuse its discretion in declining to hold a *Daubert* hearing before excluding Hodgson. This Court has stated that "[w]hile the gatekeeping function requires the district court to ascertain the reliability of [an expert's] methodology, it does not necessarily *require* that a separate hearing be held in order to do so." *United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) (emphasis added). Here, where the well-developed record contained Hodgson's report, the transcript from her seven-hour

### B. WPCA's Claims Against Flowserve and Gilbane

The district court granted summary judgment against WPCA on all of WPCA's claims against Flowserve and Gilbane. We conclude that without Hodgson's testimony, WPCA is unable to succeed on any of its claims.

As to WPCA's products liability claims, in Connecticut, a plaintiff must show (among other elements) that "the product was in a defective condition unreasonably dangerous to the consumer or user." *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 433–36 (2016). Connecticut employs two tests to analyze whether a product was unreasonably dangerous: (1) the risk-utility test; and (2) the consumer expectation standard. *Id.* The risk-utility test is the "primary test" that "will govern most cases." *Id.* at 416, 434–35. That test governs this case as well.[3] Under the test, a product is in a defective condition unreasonably dangerous to the consumer or user if:

> (1) A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger; or
>
> (2) The product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product. The factors that a jury may consider include, but are not limited to, the magnitude and probability of the risk of harm, the instructions and warnings accompanying the product, the utility of the product in relation to the range of consumer choices among products, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing.

---

deposition, and other related materials, the court acted within its discretion in excluding Hodgson without holding a hearing.

[3] WPCA attempts to argue that the consumer expectation standard should apply here. This argument was not raised below and is waived. *See Booking*, 254 F.3d at 418.

*Id.* at 434–35. Expert evidence is necessary to satisfy the risk-utility test where "the nexus between the injury and the alleged cause would not be obvious to the lay juror," because expert knowledge is often required in such circumstances "to establish the causal connection between the accident and some item of physical or mental injury." *Sanders v. Fireline, Inc.*, 295 F. App'x 373, 374 (2d Cir. 2008) (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004)).

We agree with the district court that "this is the type of complex case which requires an expert opinion as to defect and as to feasible alternative design." SPA-53. Lay jurors simply are not equipped with the relevant background knowledge about wastewater pumps to know, for instance, whether such pumps require vents, or what the appropriate pipe diameter is, or whether pumps can be run dry, or what horsepower pump motors should have. Because WPCA has presented no admissible expert evidence as to design defect or feasible alternative design, its products liability claims necessarily fail.

WPCA's CUTPA claim against Flowserve also fails. The CTPLA contains an exclusivity provision, making it the "exclusive means by which a party may secure a remedy for an injury caused by a defective product." *Gerrity v. R.J. Reynolds Tobacco Co.*, 263 Conn. 120, 126 (2003). Here, the supposed CUTPA claim is that Flowserve refused to repair or replace defective equipment based on false denials of warranty claims. The CUTPA claim thus rests on an allegation that is the exclusive province of products liability claims under the CTPLA—that the pumps were defective. For this reason, the district court properly granted summary judgment to Flowserve on this claim.

As to WPCA's express and implied warranty claims against Flowserve, the district court correctly determined that Flowserve had disclaimed all of the warranties alleged by WPCA. Flowserve's final agreement states, in all capital letters:

8

THESE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

JA-1828. The only express warranty in the final agreement reads as follows:

Vendor warrants at time of shipment to Gilbane Building Company its equipment will comply with applicable Vendor drawings and will be free from defects in workmanship and material.

JA-1827. WPCA asserts that Flowserve violated an express "certificate of proper pump functionality," as well as the implied warranties of merchantability and fitness for a particular purpose. But the terms of the final agreement clearly exclude any such warranties, as the district court rightly concluded.[4]

Finally, we conclude that the district court properly granted summary judgment to Gilbane on WPCA's breach of contract claim. WPCA argues that Gilbane breached a fiduciary duty contained in its contract with WPCA by negotiating additional contract terms with Flowserve. To make out a breach of fiduciary duty claim, WPCA must show, *inter alia*, that Gilbane "advanced [its] own interests to the detriment of" WPCA. *See Godina v. Resinall Intern., Inc.*, 677 F. Supp. 2d 560, 575 (D. Conn. 2009). The only argument WPCA makes that Gilbane advanced its own interests is that "Gilbane benefited by keeping the project on schedule." Appellant Br. 70. However, *both* parties to the contract—WPCA *and*

_____

[4] WPCA's argument that Gilbane lacked actual or apparent authority to negotiate new contract terms with Flowserve is unavailing. Gilbane's contract with WPCA explicitly stated that Gilbane is responsible for "supplementing the bidding documents," and that Gilbane may "analyz[e] . . . bids" and "mak[e] any and all necessary revisions." JA-209. An agent has "actual authority" when its "action [is] expressly authorized." *Ackerman v. Sobol Family P'ship, LLP*, 298 Conn. 495, 508–09 (2010) (citation omitted). Here, the contract expressly authorized Gilbane to make revisions to bids as necessary. Even if Gilbane did not have actual authority, it clearly had "apparent authority," meaning that "semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses." *Id.* WPCA held out Gilbane as its agent and acted as if Gilbane had authority to negotiate with Flowserve by, *inter alia*, choosing not to attend a scope review meeting at which Gilbane, Flowserve, and CDM discussed Flowserve's bid and its additional contract terms.

9

Gilbane—benefited by keeping the Project on schedule. WPCA entered into the contract and set the Project schedule because it presumably had a certain time that it wanted to have the Plant upgrade completed by. Flowserve was the low bidder on the pumps, and Gilbane helped secure Flowserve's prompt participation in the project by working with Flowserve to ensure the bid would be accepted. In short, by negotiating with Flowserve to ensure its bid was acceptable and timely, Gilbane served both parties' interests.[5]

*　　*　　*

We have considered WPCA's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

---

[5] Moreover, contrary to WPCA's repeated assertions that Gilbane hid or "conceal[ed]" Flowserve's additional contract terms from WPCA, *see* Reply Br. 27–28, the undisputed evidence demonstrates that WPCA knew about the terms. For example, prior to WPCA's application to the Clean Water Fund for funding for the Project, Gilbane sent the Flowserve bid—including the additional contract terms—to WPCA. WPCA then included that bid in its application and certified that everything in the application was "true and correct." JA-431.